## WILLIAMS *v.* OGLE.

PATENTS ; INTERFERENCE ; BURDEN OF PROOF ; REASONABLE DOUBT.

To overcome the presumption that the patentee was the first inventor of the device described in his patent, the party claiming in an interference proceeding to be the prior inventor must make out his case beyond a reasonable doubt.

No. 100.  Patent Appeals.  Submitted November 16, 1898.  Decided January 17, 1899.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference proceeding.    *Affirmed.*

The facts are sufficiently stated in the opinion.

*Messrs. Brown & Darby* for the appellant.

*Messrs. Howson & Howson* for the appellee.

Mr. Chief Justice ALVEY delivered the opinion of the Court:

This case is brought here from the Patent Office by

appeal from the decision of the acting Commissioner of Patents in a matter of interference of an application for patent by Benajah Williams, the appellant, with a patent granted to Percy J. Ogle, the appellee, for a perforated wrapper or envelope with tearing-strip.

Ogle, an English subject residing in London and an engineer by profession, filed his application in the Patent Office of the United States on December 12, 1893, asking for a patent for his invention. He filed with his specification three illustrative drawings, the second of which would seem best to illustrate the invention of the present issue. The patent was granted to Ogle May 1, 1894.

Afterwards, to wit, on April 8, 1895, nearly a year after the issue of the patent to Ogle, Williams filed his application. With his specifications he filed four illustrative drawings, and his fourth drawing seems to be very nearly, if not quite, identical with the second drawing of Ogle. And it is shown by Ogle that he had obtained patents from other governments for his invention prior to the issuance of the patent to him by the Government of the United States.

The issue of interference as framed is as follows: "A wrapper or envelope provided with two rows of perforations forming a tearing-strip, the perforations of each row being disposed at such angles to the general direction of length of said rows that the line of fracture is prevented from deviating from its proper course by succeeding perforations."

The object and description of the inventions as furnished in the specifications of the respective parties are not essentially different the one from the other. They propose a wrapper with two rows of slits or perforations, so arranged that the intermediate tearing-strip will follow, in its rupture of the wrapper, the lines of perforations, and thus avoid the tearing of the matter enclosed.

Williams, in his preliminary statement, says that he conceived the invention set forth in the declaration of interference on or about the 1st of April, 1893; that he disclosed

the same to others on or about the 1st of May, 1893; and about the same time he reduced the same to practice by the construction of a full-sized operative wrapper embodying the invention, and capable of use as a wrapper, and actually used the same for the purpose of a wrapper; that he made sketches illustrating the idea involved in the issue about the 1st of May, 1893; that he never made a model, other than a full-sized operative wrapper, capable of use; that since about the 1st of May, 1893, he has continued to make wrappers embodying the said invention.

Ogle, in his preliminary statement, says he made the invention involved in the issue on or about the 5th of October, 1893, he being at the time in England; that patents for his invention were applied for and obtained as follows: From Great Britain, October 26, 1893; Germany, December 5, 1893; France, December 4, 1893; Canada, February 26, 1894; Austria, February 5, 1894; Hungary, February 1, 1894; Belgium, January 17, 1894; Switzerland, February 27, 1894. In his testimony given in support of his preliminary statement, he proffers the production of the patents thus obtained. He further says in his preliminary statement, and also in his testimony, that his invention had been referred to and fully described in a large number of periodicals published in London and other places, between about the middle of January, 1894, and the 10th of March of that year; that he had explained his invention fully to several persons in October, 1893; and that knowledge of his invention was introduced into the United States by newspapers being forwarded in wrappers, and also by forwarding to his solicitors in New York papers for application for patent in December, 1893, and which were filed in the Patent Office December 12, 1893. He further says that his invention has been in continuous and very extensive use since its first introduction in 1893, and nearly all the principal English periodicals, and sheet music and musical publications, have been sent out in it, and the trade has been thoroughly established from that

date up to the time of making the statement; and that the output for the last month preceding that date was 386,000.

Both parties took testimony, and both parties testified in their own behalf, and swore to substantially the same state of facts set forth in their respective preliminary statements. Upon quite a full and clear review of the evidence the examiner of interferences came to the conclusion that Williams had failed to establish such case on the proof as was required to overcome the strong *prima facie* case made by the patent and the proof produced on the part of Ogle; and he accordingly awarded priority to Ogle. From this decision Williams appealed, and the Board of Examiners-in-Chief, then composed of two members only, reversed the decision of the examiner of interferences, and awarded priority to Williams. Each member of the board delivered his own separate opinion, concurring, however, in the conclusion that Williams was entitled to priority. From this latter decision Ogle appealed to the Commissioner of Patents, and on that appeal the acting Commissioner fully and critically reviewed the evidence, and came to the conclusion, with the examiner of interferences, that Williams had failed to establish his case as against that of Ogle, and consequently Ogle was entitled to priority. It is from that decision that this appeal is taken.

It is conceded that the burden of proof is upon Williams, and that nothing less than proof that establishes the fact of priority of invention in his favor beyond a reasonable doubt is sufficient to overcome the case presented by Ogle. This is the character of case where the principle that requires proof to establish the fact of priority of invention beyond a reasonable doubt applies with great strictness. Coming in to controvert and overthrow a prior patent, Williams assumes the position with all its burdens of a defendant in a suit who sets up to defeat the right of the plaintiff, the want of novelty in the invention covered by the patent held by the plaintiff, or the fact of existence of priority of invention by the defendant, or some third person

having a right to the invention superior to that claimed by
the plaintiff. In such case, the patent held by the plaintiff
furnishing *prima facie* evidence that the patentee is the first
inventor of the device described in the patent and of its
novelty, that *prima facie* effect can only be overcome and
defeated by clear and indubitable evidence. In *Cantrell* v.
*Wallick*, 117 U. S. 690, the Supreme Court of the United
States, in speaking of the effect of a patent in such case,
said:

"The burden of proof is upon the defendant to establish
this defense; for the grant of letters patent is *prima facie*
evidence that the patentee is the first inventor of the device
described in the letters patent and of its novelty. *Smith* v.
*Goodyear Dental Vulcanite Co.*, 93 U. S. 486; *Lehnbeuter* v.
*Holthaus*, 105 U. S. 94. Not only is the burden of proof
to make good this defense upon the party setting it up, but
it has been held that every reasonable doubt should be re-
solved against him." Citing *Coffin* v. *Ogden*, 18 Wall. 120,
124, and *Washburn* v. *Gould*, 2 Story, 122, 142.

In view of this *onus* of proof, it was first necessary to ex-
amine the evidence produced on the part of Williams; and
this has been done with great care and fullness by the act-
ing Commissioner. In stating and commenting upon the
case he has said:

"The invention in controversy is a specific construction
of wrapper provided with a tearing-strip formed by two rows
of perforations arranged at angles to the general direction of
length of the row. The Ogle patent shows the construction
of the issue and shows no construction not within the terms
of the issue. There is no doubt that it shows an operative
device in the two forms shown—that is, a device in which
the tearing-strip may be torn completely out by a single
operation. Williams shows in Figures 1 and 2 of his appli-
cation constructions not within the terms of the issue and
not capable of operating in the same way as the construction
set forth in the issue—that is, constructions in which the

tearing-strip can not with certainty be torn out by a single operation. Fig. 4 of the application of Williams is essentially a copy of Fig. 2 of Ogle's patent.

"Ogle, being a foreign applicant, can not be given earlier date for reduction to practice, either actual or constructive, of his invention than the date of his application, which was December 12, 1893.

"Williams claims in his preliminary statement that he conceived the invention of the issue about the 1st of April, 1893; disclosed it to others about the 1st of May, 1893, and reduced it to practice about the same time. It appears from the testimony given by Williams in the case that in the month of April, 1893, he was considering 'the advisability of an easy method of opening a newspaper; and that his first idea was the idea of a perforated sheet of paper;' and that afterward he conceived the idea of putting on a thread. He states that he completed the conception of a slit form of wrapper and a string form of wrapper about the same time— that is to say, some time in April, 1893. That he conceived and reduced to practice the string form of wrapper at this time may be admitted. He filed on May 28, 1894, an application for the string wrapper, on which Patent No. 558,244 was granted April 14, 1896, and proceeded to devise machinery for its manufacture, and to manufacture it and put it upon the market in large numbers. He does not testify that he manufactured the slit wrapper, claimed by him to have been conceived and reduced to practice at the same time with the string wrapper, or placed it upon the market at any time prior to the issuance of the patent to Ogle, or in fact for months after the issuance of that patent. He states in his answer to a question put to him, that the first wrapper he undertook to make he made with a double row of perforations, but found it not very reliable. He states that the slit form of wrapper is easier to make by machinery than the string form, and that with a single machine from 50,000 to 100,000 per day of the slit wrappers can be made, while

of the string wrappers only from 35,000 to 60,000 can be made per day.

"If it be admitted that Williams had in April or May, 1893, reduced to practice the slit form of wrapper, it necessarily follows that, although presumably an experienced business man, he deliberately laid aside an effective and cheaply-made form of wrapper in favor of a form which was more expensive to manufacture, and little, if any, more effective. It is difficult to believe that a man of his experience in business would deliberately do this. His actions, judged by the ordinary laws that govern human conduct, must be taken as throwing great doubt upon his testimony as to actual reduction to practice of the invention of the issue in April or May, 1893, or at any time prior to the issue of Ogle's patent.

"Williams brings to support his own testimony the testimony of four other witnesses. One of these, Vale, testifies that he saw some slit wrappers in December, 1895. As this was more than a year and a half after the grant of Ogle's patent, it does not appear that it is of importance in the case. W. H. G. Roden testifies that the invention of the issue was disclosed to him about the 1st of May, 1893, by Williams, and that at that time Williams showed him a wrapper; placed the wrapper about a magazine and removed it by tearing the wrapper open. When asked, 'Did or did not the wrapper operate successfully and satisfactorily?' he answered, as might have been expected from the form in which the question was put, that it operated successfully, but he was unable to describe the construction of the wrapper, and when asked to make a sketch he made the sketch of a device which is absolutely inoperative.

"This testimony at most proves only that Williams had some form of wrapper, with a tearing-strip, about the 1st of May, 1893, but it does not prove that he had at that time the wrapper of the issue.

"E. H. Roden testifies that wrappers were shown him about

the 1st of May, 1893, by Williams, and that he used these wrappers at that time; and in answer to the question, 'Did the wrappers operate satisfactorily?' said, as did W. H. G. Roden, and as might have naturally been expected from the form of the question, that they did. What is meant by operating satisfactorily, in the testimony of this witness and in the testimony of W. H. G. Roden, is not at all clear. It may be that the form shown in Fig. 1 of Williams' application, or that shown in Fig. 2, could be made to operate 'satisfactorily' if placed about a paper or magazine in the manner described by these witnesses—that is to say, merely held about the paper and not secured by paste or mucilage, as it would be secured in actual use. It may be that 'satisfactorily' means that a partial tearing only was effected.

"The other witness is one Gaynor. His testimony is to the effect that he was shown a slit wrapper in October, 1893, by Williams. In response to the question, 'Did it operate successfully?' he, like the other witnesses, stated that it did. Gaynor, while teaching dancing from October until May, was employed by Williams from May to October, but he does not know when Williams began the manufacture of slit wrappers, and never saw any slit wrappers produced for sale at the factory, although he knew that Williams was engaged in the manufacture of the string wrappers. None of the wrappers which were shown to the Rodens, in May, 1893, or to Gaynor, in October, 1893, were preserved. It is true that an attempt is made to account for this by the statement that the wrappers were destroyed in demonstrating their use. A bundle of slit wrappers which was at the office of the Williams Wrapper Company, and which it is claimed embodied the invention in issue, was destroyed by fire about a month before the 30th of April, 1896. The interference was declared October 2, 1895. In view of the fact that this bundle of slit wrappers would be of material importance as evidence for Williams, it is remarkable that at least some of them were not put in the hands of his attorneys prior to the date at which the fire which destroyed them occurred. The

two Rodens are relatives of Williams and are neither of them engaged in the manufacture or use of wrappers. Gaynor is, as before stated, a teacher of dancing, and during a part of the year employed by Williams. It is remarkable that Williams did not make any attempt to place the slit wrappers upon the market, or show them to manufacturers or to the trade. The failure of Williams to make an attempt to put his slit wrappers upon the market, notwithstanding they could be manufactured more rapidly and cheaply than the string wrappers; his failure to apply for a patent for the slit wrapper until nearly a year after the issuance of the Ogle patent, the evident copying of drawing, description and claims from the Ogle patent, when taken in connection with the fact that he applied promptly for a patent for his string wrapper, manufactured it in large quantities and put it upon market, indicate that whatever he did with reference to the wrapper of the issue in the spring of 1893, or, at any rate, prior to the issuance of Ogle's patent, amounted to nothing more than an abandoned experiment. His conduct outweighs the testimony given by him and his witnesses; and I can not hold that he has proved his case beyond a reasonable doubt."

See case of *Wurts* v. *Harrington,* 10 App. D. C. 149, and cases therein referred to.

This review of the acting Commissioner presents the entire case, so far as it is supported by the evidence introduced on the part of Williams to overcome and defeat the patent granted Ogle. We think the conclusion reached is fully warranted by the proof and that no further comment is necessary. Williams has failed to make out his case according to the requirements of the law, and it follows that the decision appealed from must be affirmed; and we direct the proceedings and opinion of this court to be certified to the Commissioner of Patents to be recorded, as provided by the statute.

*Ruling and decision affirmed, with directions to certify opinion and proceedings to Commissioner of Patents.*